UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

CHARESE JOHNSON,

*Defendant.*

Criminal Action No. 18-388-3 (RDM)

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Charese Johnson's motion to vacate her conviction and sentence pursuant to 28 U.S.C. § 2255. Dkt. 192. For the reasons that follow, the Court will **DENY** that motion.

**I. BACKGROUND**

Following a jury trial, Johnson was convicted of three counts of aiding and assisting the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Min. Entry (July 1, 2021). Each of the three counts involved the preparation of a false tax return—specifically, Forms 1040X—that claimed fictitious tax refunds on behalf of Johnson's clients. Dkt. 90 (Superseding Indictment). The return charged in Count One was a Tax Year 2012 Form 1040X that claimed a refund of $463,961 on behalf of Bladen Russell III, *id.* at 3; *see also* Dkt. 191-3 at 64 (Gov't Tr. Ex. 83), while the returns charged in Counts Two and Three involved Tax Year 2011 Forms 1040X that respectively claimed $416,200 and $280,000, on behalf of Johnny and Maria Moore, Dkt. 90 at 3; *see also* Dkt. 191-3 at 16 (Gov't Tr. Ex. 51); Gov't Tr. Ex. 102.

Johnson's defense at trial was not that the claimed refunds were legitimate; instead, her trial counsel argued that she had not, in fact, prepared the returns at issue. *See, e.g.*, Dkt. 167 at

1

76 (Trial Tr. 593).  The government responded with evidence linking Johnson to those returns.  This evidence included Russell's testimony that Johnson had prepared the return charged in Count One on his behalf.  *See* Dkt. 164 at 68 (Trial Tr. 288).  And, as for the returns charged in Counts Two and Three, the government introduced Johnson's sworn statement from a civil proceeding before the U.S. District Court for the District of Maryland in which she acknowledged that she "prepared [the] amended 1040x tax returns" at issue in Civil Case Number 15-cv-3378, Gov't Tr. Ex. 81 at 1, which included the Forms 1040X in government Exhibits 51 and 102, *see* Dkt. 163 at 47–49 (Trial Tr. 148–50).[1]

Following her conviction, Johnson's trial counsel (at her request) moved to withdraw.  Dkt. 158 at 1.  Replacement counsel filed an appearance on November 17, 2021, *see* Dkt. 172, and, following several motions to continue, the Court imposed sentence (36 months of incarceration) on February 14, 2022, *see* Min. Entry (Feb. 14, 2022); *see also* Dkt. 187.

On April 1, 2022, Johnson moved to set aside her conviction pursuant to 28 U.S.C. § 2255, arguing that her trial counsel was constitutionally ineffective for failing to call a handwriting expert at her trial.  Dkt. 192.  The Court held a two-part evidentiary hearing on Defendant's motion on June 2, 2022, *see* Min. Entry (June 2, 2022), and September 21, 2022, *see* Min. Entry (Sept. 21, 2022).  Over the course of that hearing, the Court heard testimony from two proposed handwriting experts, from Johnson's trial counsel, and from Johnson herself.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner serving a sentence imposed by a federal court may move the sentencing court to vacate, set aside, or correct the sentence if it "was imposed in

---

[1] Johnny and Maria Moore, who were named as Defendants in this matter in the original indictment, *see* Dkt. 1, died during the course of these proceedings.

violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  The required showing is a demanding one, which poses "a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).  The Court is "authorized to grant relief only if [it] determine[s] that the challenged sentence resulted from a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (internal quotation marks and citation omitted); *see also United States v. Ashton*, 961 F. Supp. 2d 7, 11 (D.D.C. 2013) (describing relief under Section 2255 as "an extraordinary remedy in light of society's legitimate interest in the finality of judgments").  The movant bears the burden of proof and must demonstrate her right to relief by a preponderance of the evidence.  *See United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973) (per curiam); *United States v. Valdez*, 199 F. Supp. 3d 13, 17 (D.D.C. 2016).

### III.  ANALYSIS

Johnson presses two theories of relief, both premised on the contention that her trial counsel was constitutionally ineffective in violation of the Sixth Amendment.  *See* Dkt. 191 at 9–14.  To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that her "counsel's performance 'fell below an objective standard of reasonableness,' and (2) [that] 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).  "Judicial scrutiny of counsel's performance must be highly deferential," and the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 689. A defendant's failure to carry her burden as to either *Strickland* prong defeats an ineffective assistance of counsel claim. *See id.* at 697.

**A.      Failure to offer handwriting expert**

Johnson first argues that her trial counsel was ineffective because he failed, despite her urging, to call a handwriting expert witness to challenge the government's contention that she signed the three tax returns identified in the superseding indictment. Dkt. 191 at 1–2, 9–13. She maintains—in an affidavit and in her testimony at the evidentiary hearing—that she told her trial counsel that she "did not sign any of the[] signatures which were on the false documents" and that she "repeatedly asked" trial counsel to secure a handwriting expert in the weeks leading up to trial. Dkt. 191-1 at 2–3, 5 (Johnson Aff. ¶¶ 4, 6); *see also* Dkt. 207 at 89–91 (June 2, 2022 Hrg.). Counsel's refusal to call an expert, Johnson maintains, rendered his representation constitutionally deficient. Dkt. 191 at 1, 13; Sept. 21, 2022 Hrg. Tr. (Rough at 23) ("[M]y point is he should have gone out and found an expert" and asked "what [that expert] th[ought]."). In an effort to show that a handwriting expert would have made a difference, Johnson offers the testimony of two handwriting experts, both of whom now represent that, if called at trial, they would have testified that Johnson did not sign at least some of the returns at issue. *See* Dkt. 207 at 51 (June 2, 2022 Hrg.); Sept. 21, 2022 Hrg. Tr. (Rough at 44).

1.      *Deficient performance*

To satisfy the first *Strickland* factor—that is, deficient performance—Johnson must show that her "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688; *see also United States v. Gwyn*, 481 F.3d 849, 853 (D.C. Cir. 2007). To succeed, she must demonstrate that her counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth

4

Amendment." *Strickland*, 466 U.S. at 687.  The Court must analyze counsel's conduct as a whole and must consider his actions based on how a reasonable lawyer would have viewed the case at the time, without the benefit of hindsight.  *Id.* at 688–89.  The Court, moreover, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Significantly, "the representation afforded by counsel is not constitutionally ineffective under [*Strickland*] simply because [a defendant] believe[s] that litigation strategies other than the ones employed by counsel might have been more successful," *United States v. Catlett*, 97 F.3d 565, 568 (D.C. Cir. 1996).  Instead, to prevail on a claim of ineffective assistance of counsel, a defendant must show that the decision (or inaction) that she challenges was "unreasonable" and not merely a strategic choice.  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *see also Strickland*, 466 U.S. at 690 (explaining that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Here, Johnson argues that her trial counsel's performance fell below that "objective standard of reasonableness because he "neglected the obvious need for a handwriting consultation." Dkt. 191 at 13.  In Johnson's view, the prosecutor's acknowledgement during his closing argument that "Johnson's signature appears to vary across some of these same returns"—along with Johnson's repeated statements to counsel that "she was not the signer of the returns"—"cried out for a handwriting expert." *Id.* at 6; *see also* Dkt. 167 at 61 (Trial Tr. 578) ("Johnson's signature appears to vary across some of these same returns.").

The government counters, based on evidence introduced at the September 21, 2022 evidentiary hearing, that trial counsel made a reasonable decision to "stay away from handwriting experts."  Sept. 21, 2022 Hrg. Tr. (Rough at 75).  At that evidentiary hearing,

5

Johnson's trial counsel testified that, when he was retained in November 2019, he received a case file from Johnson's prior attorney, Christopher Davis. *Id.* at 4. That case file contained "notes [Davis] had taken based on a[n] [October 28, 2019] conversation with a handwriting expert[, John Hargett]," *id.* at 5, which documented Hargett's view that the signatures on at least two of the relevant Forms 1040X—government Trial Exhibit 51, the 2011 Form 1040X charged in Count Two and government Trial Exhibit 83, the 2012 Form 1040X charged in Count One—were "[p]robably [Johnson's] (more likely than not)," Gov't Ex. 202. As far as the Court can tell, the notes did not mention government Trial Exhibit 102, the 2011 Form 1040X charged in Count Three. *Id.* As a matter of trial strategy, however, it is safe to assume that the defense would have had little interest in calling a witness to testify that Johnson "probably" signed the allegedly fraudulent Form 1040X submitted on behalf of Bladen Russell III and the first of the two allegedly fraudulent Forms 1040X submitted on behalf of Johnny and Maria Moore, even assuming (for sake of argument) that the witness would have testified that Johnson probably did not sign the second Form 1040X submitted on the Moores' behalf. But in any event, trial counsel testified that he was "aware of the results of the [Hargett] handwriting analysis;" that he "ha[d] a conversation with [Defendant's prior counsel] about his notes and his conversation with Mr. [Hargett];" and that this information had a "bearing on [his] trial strategy." Sept. 21, 2022 Hrg. Tr. (Rough at 8–9); *see id.* at 9 ("I didn't think it wise or prudent or helpful to [Johnson] for us to pursue this expert or to present this expert."). That testimony would seem to put the matter to rest.

Johnson nevertheless argues that it was unreasonable for trial counsel to fail to consult a *second* handwriting expert who might have, if engaged, proffered a different opinion. *Id.* at 23 ("[H]e should have gone out and found an expert . . . ."); *see also id.* at 69 ("[A] competent

6

defense counsel who had not talked to this expert . . . would have said I should go get my own expert . . . ."). But Johnson "has given [the Court] no basis [to] believe[e] that trial counsel's" reliance on Hargett's conclusions "[fell] below an objective standard of reasonableness," *Gwyn*, 481 F.3d at 854 (last alteration in original) (quoting *United States v. Askew*, 88 F.3d 1065, 1070 (D.C. Cir. 1996))—especially because Johnson herself signed a declaration in a civil proceeding in which she admitted that she had prepared several tax returns, including the Moores' Forms 1040X, *see* Gov't Tr. Ex. 81 at 1; *see also* Dkt. 163 at 47–49 (Trial Tr. 148–50) (testimony explaining that, by signing the affidavit in government Exhibit 81, Johnson was admitting to signing the two Forms 1040X that form the basis of Counts Two and Three). *Cf. Hoover-Hankerson v. United States*, 792 F. Supp. 2d 76, 84 & n.3 (D.D.C. 2011) (rejecting ineffective-assistance claim where the defendant "fail[ed] to plead any facts to substantiate her claim that her counsel's decision not to obtain a[] [handwriting] expert witness was outside of the range of competent professional assistance").

That conclusion is bolstered, moreover, by government Exhibit 201, an email that trial counsel drafted (but did not send) to Johnson on June 27th, 2021—four days after the start of trial and one day after Johnson forwarded trial counsel a forensic examiner's report about her documents. *See* Gov't Ex. 201; Sept. 21, 2022 Hrg. Tr. (Rough at 11). (Government Exhibit 201 was admitted, without objection, on the understanding that counsel was "offering it to show [his] existing state of mind." Sept. 21, 2022 Hrg. Tr. (Rough at 13)). In that email, trial counsel wrote that he "ha[d] not been able to speak to [Johnson's requested expert];" that he was concerned about proffering an expert after the start of trial; and that, "[s]trategically, [he] th[ought] it ma[d]e sense t[o] keep the burden on the government." Gov't Ex. 201. "The jury should be looking to the government for experts," he wrote, "not you." *Id.* Although some of

7

the reasoning proffered in the email was timing-related—that is, any effort to identify a new expert came too late—the exhibit also provides insight into counsel's strategic decision to "keep the burden on the government," rather than to call an expert witness that would be subject to cross-examination. *Id.*; *see United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("The decision whether to call any witnesses on behalf of the defendant . . . is a tactical decision of the sort engaged in by defense attorneys in almost every trial."); *United States v. Staples*, 410 F.3d 484, 488–89 (8th Cir. 2005) (explaining that the "decision not to call a witness is a 'virtually unchallengeable' decision of trial strategy"); *United States v. Robinson*, No. 20-cr-98, 2020 WL 5569953, at *16 (D.D.C. Sept. 17, 2020), *rev'd in part on other grounds*, 68 F.4th 1340 (D.C. Cir. 2023) (concluding that trial counsel's decision not to "call[] an expert witness who could be subject to damaging cross-examination"—but instead to "engage in rigorous cross-examination of the United States' fact witnesses and expert witness"—was a reasonable trial strategy).

The trial record further supports the conclusion that counsel made a reasonable strategic decision to focus on the government's burden. In closing, he argued to the jury:

> You'll be able to compare th[e] signatures [in the government's exhibits]. . . . I don't know that anyone here is a handwriting expert. I'm not a handwriting expert, no one at the government's table is. And the government certainly didn't present that type of evidence or testimony to you, right. The government made a point in its closing to say that . . . the signatures were pretty similar. Now, ladies and gentlemen, your burden here isn't to decide if the signatures were pretty similar. Your burden is not to decide whether it's pretty likely that Ms. Johnson is the person who prepared these documents. Your burden is not to decide whether it's pretty likely that Ms. Johnson aided, assisted in, procured, counseled on the income tax returns at issue in counts one through three of the indictment. Your burden here, your job here, the government's burden here is to convince you beyond a reasonable doubt that Ms. Johnson is the person that prepared these forms. That's the task here. We're not talking about pretty close or pretty likely, maybe it looks like it . . . . That is not proof beyond a reasonable doubt. Ladies and gentlemen, you deserve more, you should expect more, and you should demand more from the government in proving its burden in this case.

8

Dkt. 167 at 76–78 (Trial Tr. 593–95).

Johnson has failed to offer any basis to find that trial counsel's strategic decision to focus on the government's burden—especially in light of prior counsel's consultation with Hargett—fell outside the "wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. Even if a "litigation strateg[y] other than the one[] employed by counsel might have been more successful," that alone is insufficient to satisfy the demanding burden under *Strickland*. *Catlett*, 97 F.3d at 568. And, here, even with the benefit of hindsight, the Court is unpersuaded that the decision was unsound.

Johnson's ineffective-assistance claim, accordingly, fails at the first prong.

2.      *Prejudice*

Johnson's *Strickland* claim fails at the second prong as well because she cannot show that she was prejudiced by trial counsel's failure to offer the testimony of a handwriting expert. To show prejudice, a defendant must prove that counsel's incompetence was "so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In practice, this means that the defendant must show that, "there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *United States v. Loughery*, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting *Strickland*, 466 U.S. at 694). The defendant "must shoulder the burden of showing, not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). As relevant here, "if the alleged *Strickland* violation is based on a failure to call an expert witness, the defendant must

demonstrate" with particularity "what the 'scientific expert would have stated'" and "that the testimony would have been favorable to a particular defense." *Robinson*, 2020 WL 5569953, at *16 (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)).

In her first effort to make this showing, Johnson offered the testimony of Curt Baggett, who testified that, if called at trial, he would have opined that the signatures on the Forms 1040X prepared for the Moores "were not written by Charese Johnson." Dkt. 207 at 51 (June 2, 2022 Hrg.). (Notably, Baggett did not examine the Form 1040X prepared for Russell. *See id.* at 84.) But that argument skips an important step in the process. Even if Johnson's trial counsel had sought out Baggett and had decided to call him as a witness at trial, the Court would have been required to decide whether he was qualified to testify as an expert, and Johnson has failed to carry her burden of showing that Baggett's testimony would have been admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). To the contrary, as the government emphasizes, federal courts across the nation have repeatedly declined to permit Baggett to testify as a handwriting expert. *See Balimunkwe v. Bank of Am.*, No. 14-cv-327, 2015 WL 5167632, at *8–14 (S.D. Ohio Sept. 3, 2015); *Routh v. Bank of Am.*, No. 12-cv-244, 2013 WL 4040753, at *5–6 (W.D. Tex. Aug. 7, 2013); *United States v. Revels*, No. 10-cv-110-1, 2012 U.S. Dist. LEXIS 65069, at *16–26 (E.D. Tenn. May 9, 2012); *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1377–80 (M.D. Ga. 2006); *Wheeler v. Olympia Sports Ctr., Inc.*, No. 03-cv-265, 2004 WL 2287759, at *3–4 (D. Me. Oct. 12, 2004).

The Court's review of these decisions, moreover, reveals a troubling pattern: in finding Baggett unfit to testify as an expert, courts have not only rejected his qualifications as an expert or the methodologies underlying his opinions, but they have expressed concerns about his credibility and the truthfulness of his representations. In *Balimunkwe*, for example, the U.S.

District Court for the Southern District of Ohio noted that, although "Mr. Baggett list[ed] nearly 100 'cases and or cities' in which he has been 'qualified or appointed,'" the court was "unable to corroborate Mr. Baggett's representation;" the court found, instead, that "the record in at least some of the federal cases listed by Mr. Baggett does not reflect that the court assessed his expert credentials and qualified Mr. Baggett as an expert." 2015 WL 5167632, at *8. That same decision expressed "serious concerns regarding the accuracy of Mr. Baggett's representations in the background information he has provided as to the number of cases he has completed and his years of experience." *Id.* The U.S. District Court for the Eastern District of Tennessee, likewise, expressed "grave concerns about Mr. Baggett's credibility," *Revels*, 2012 U.S. Dist. LEXIS 65069, at *23, while the U.S. District Court for the District of Maine pointed to a state court proceeding in which Baggett "falsely testified that he had been designated by the court as an expert witness," *Wheeler*, 2004 WL 2287759, at *4 n.3. And, in the state court proceeding referenced by the District of Maine, the Texas Court of Appeals noted that "the prosecutor's argument that Baggett was a charlatan was proper as a reasonable deduction from the evidence." *Brown v. State*, No. 05-97-cr-00289, 1999 WL 61858, at *8 (Tex. App. Feb. 9, 1999). More recently, the U.S. District Court for the District of New Jersey "note[d] that numerous federal courts throughout the country . . . have excluded [Baggett's] testimony as unreliable on the basis of, among other things, 'serious concerns' with respect to his credentials." *Albert v. Specialized Loan Servicing, LLC*, No. 19-cv-74, 2020 WL 865435, at *9 n.5 (D.N.J. Feb. 14, 2020) (collecting cases).

Beyond all of this, the government notes (and Johnson does not dispute) that Baggett has a criminal history that includes "felony convictions for theft and aggravated assault," along with "a deferred adjudication after pleading guilty to the misdemeanor offense of Tampering with a

11

Government Record." Dkt. 195 at 8 (quoting *Revels*, 2012 U.S. Dist. LEXIS 65069, at *24–25). To be sure, these convictions are all over two decades old. But, as the Eastern District of Tennessee emphasized, the most recent conviction—from 2000, for tampering with a government document—"directly implicates his character for truthfulness." *Revels*, 2012 U.S. Dist. LEXIS 65069, at *25. After Baggett attempted to explain this past conduct during his testimony at a sentencing hearing before that court, the court reviewed the underlying court records and found them so irreconcilable with Baggett's explanation that the court concluded that "it appear[ed] . . . that Mr. Baggett was testifying untruthfully at [the] [d]efendant's sentencing hearing with respect to his prior criminal record." *Id.* at *26.

Nor did Baggett's testimony at the June 2, 2022 evidentiary hearing assuage the Court's concerns. Baggett testified, at the hearing, that he had "no idea" for how long he had been a member of some of the organizations and associations listed on his resume and that he had "no idea" what, if anything, he learned about in the referenced professional programming. Dkt. 207 at 21–23 (June 2, 2022 Hrg.). He conceded, moreover, that he has never been certified by the American Board of Forensic Document Examiners; that the educational program he attended at Handwriting University was non-accredited; and that none of the publications listed on his resume were published in peer-review journals. *Id.* at 53–55. Indeed, most of the publications listed on Baggett's resume were self-published or publicized online by Handwriting University—the non-accredited, remote learning platform owned and operated by Baggett's son. *Id.* at 53–56. Nothing in his testimony would have permitted this Court to find that any expert opinion that he might have offered at trial had "a reliable basis in the knowledge and experience of his discipline"—a central prerequisite for admitting expert testimony in federal court. *United States v. Nwoye*, 824 F.3d 1129, 1136 (D.C. Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*,

12

526 U.S. 137, 152 (1999)).  Finally, even if the Court had (somehow) concluded that Baggett was qualified to testify as an expert, the record described above would have provided fertile ground for impeachment on cross-examination, significantly diminishing the value of his testimony and likely hurting Johnson's case.

Recognizing that Baggett would not have helped her case, Johnson shifted gears after the June 2, 2022 hearing and requested to call yet another handwriting expert (the third that she or her lawyers have identified since the investigative stage of her case) who would have been prepared, if called, to testify at trial that "none of the questioned signatures were signed or written by Charese Johnson."  Sept. 21, 2022 Hrg. Tr. (Rough at 37, 44).  Johnson asserts that this new expert, Beverly East, is "more credible" and "a far superior expert to" Baggett.  Dkt. 202 at 1.  Although the Court allowed Johnson to call East at the second evidentiary hearing over the government's objection, *see* Min. Order (Sept. 12, 2022), the Court remains skeptical that Johnson can establish *Strickland* prejudice by proffering a new expert, after filing her Section 2255 petition *and* after the Court held a hearing on that petition, simply because the expert that she claimed her trial counsel should have called to testify at trial, and who she called to testify at her Section 2255 hearing, was unqualified.  For present purposes, however, the Court need not decide whether such an open-ended search for an expert is proper because Johnson, in any event, has failed to demonstrate that "there is a reasonable probability that . . . the result of the proceeding would have been different" had East testified at trial.  *Strickland*, 466 U.S. at 694.  As explained below, the Court concludes that at least portions of East's testimony would have been inadmissible and that, even if she was allowed to testify in other respects, it is unlikely—and certainly not "reasonabl[y] probable"—that her testimony would have changed the result.

13

To start, at least portions of East's testimony would not have satisfied *Daubert*. Under *Daubert*, the Court must consider (1) "whether [a theory or technique] can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the "known or potential rate of error;" and (4) whether a technique has garnered "[w]idespread acceptance" in the relevant scientific communities. 509 U.S. at 593–94. As relevant here, East testified that the all-caps, block print signature on government Exhibit 102—the 2011 Form 1040X charged in Count Three—was not Johnson's signature, even though all of Johnson's self-provided "known signatures" were in cursive. Sept. 21, 2022 Hrg. Tr. (Rough at 43–47). She explained: "[I]f . . . you're changing from script to block, your height, the proportion and the width would be very much the same, and they're not." *Id.* at 45. When questioned by the Court as to the basis of her opinion and whether there were any "peer-reviewed studies" that support her testimony about the "chang[e] from script to block," East was unable to cite any relevant research. *Id.* at 45–46. And when provided the opportunity to supplement the record with any peer-reviewed research on that point, East proffered two journal abstracts that seem (at best) to address analyzing hand-printed and cursive signatures independently, but do not support East's testimony that the common characteristics of a person's cursive writing can help identify that writer's block print. Dkt. 214-1 at 2–3. And, although the defense submits a two-sentence-long excerpt from a book indicating that "writers transfer many of their writing habits from handwriting to handprinting," Dkt. 241-2 at 2, the Court cannot discern from that short excerpt whether the author ultimately concludes that those transferred "writing habits" permit handwriting experts reliably to determine whether the same person wrote one signature in cursive and another that was block printed. The Court is, accordingly, unconvinced that East's technique, at least as to analyzing that exhibit, was "subjected to peer

14

review and publication" or that it has garnered "[w]idespread acceptance" in the relevant scientific communities. *Daubert*, 509 U.S. at 593–94. The Court therefore cannot conclude that East would have, if called, been qualified under *Daubert* to opine on whether the signature on Exhibit 102 was Johnson's.

Beyond that difficulty, the government elicited testimony at trial establishing that Johnson prepared a 2011 Form 1040 on behalf of the Moores, *see* Dkt. 167 at 25 (Trial Tr. 542), and that form includes a signature that is—at least to the untrained eye—very similar to the 2011 Form 1040X charged in Count Two, *compare* Dkt. 191-3 at 5 (Gov't Tr. Ex. 50) *with* Dkt. 191-3 at 16 (Gov't Tr. Ex. 51). Nothing that East said at the Section 2255 hearing would have, the Court's view, led a reasonable jury to find otherwise. But, even more importantly, Johnson fails to offer any meaningful response to the government's evidence that she admitted in a civil proceeding in federal court that she prepared the false returns charged in Counts Two and Three. Government Exhibit 81 included Johnson's declaration that she, "Charese Johnson, doing business as Prodigy Accounting Services, prepared [the] amended 1040x tax returns" at issue in Civil Case Number 15-cv-3378—including government Exhibit 51, the Form 1040X charged in Count Two and government Exhibit 102, the 1040X charged in Count Three—"at no cost . . . in good faith without intentionally misleading fraudulent actions." Gov't Tr. Ex. 81 at 1; *see also* Dkt. 163 at 47–49 (Trial Tr. 148–50) (testimony identifying the government Exhibits 51 and 102, charged in Counts Two and Three, as tax returns at issue in Civil Case Number 15-cv-3378). The government disputed her averment that she prepared those forms "in good faith" and without fraud, but the fact remains that Johnson had previously admitted to preparing the forms from which she now attempts to distance herself on the basis of her signature. In response, Johnson testified at the Section 2255 hearing that she did not understand which taxpayers or tax returns

15

the declaration referenced. Dkt. 207 at 92–95 (June 2, 2022 Hrg.). But that testimony carries little weight for present purposes because she did not take the stand at trial to testify to that effect, nor did she offer any other evidence suggesting that she signed the declaration without understanding what it said. The declaration constituted an admission and was thus, if anything, more probative of whether Johnson signed the returns than East's testimony regarding one of the two returns, if offered, might have been, and it is now too late (after trial) for Johnson to disavow her own declaration. Similarly, although Johnson testified at the June 2, 2022 evidentiary hearing that she did not "sign the tax returns . . . that were used as a basis for [her] conviction," *id.* at 89 (June 2, 2022 Hrg.), she made no such assertion at trial. Notably, Johnson does not now claim that she would have testified in support of either of these contentions if her counsel had called a handwriting expert at her trial.

As for the tax return at issue in Count One, the individual on whose behalf Johnson prepared the return testified at trial that Johnson prepared it at his request. *See* Dkt. 164 at 68 (Trial Tr. 288). *Cf. United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014) (concluding that the failure to call a handwriting expert was not prejudicial where "[t]he record shows that [the defendant] admitted signing [the relevant] forms"). To be sure, the signatures on the three returns differ in appearance. *Compare* Dkt. 191-3 at 16 (Gov't Tr. Ex. 51) (2011 Form 1040X, charged in Count Two), *with* Dkt. 191-3 at 64 (Gov't Tr. Ex. 83) (2012 Form 1040X, charged in Count One), *with* Gov't Tr. Ex. 102 at 2 (2011 Form 1040X, charged in Count Three). But the primary difference is between the two returns prepared on behalf of Johnny and Maria Moore, which she admitted to preparing in the declaration. With respect to the one return that she did not admit to preparing, Johnson's signature features a cursive, sweeping style, Dkt. 191-3 at 64 (Gov't Tr. Ex. 83), similar to the signatures she used elsewhere, *see, e.g.*, Dkt. 191-3 at 5 (Gov't

Tr. Ex. 50). The jury was well equipped to judge for itself whether the signatures were similar, and, where they were not, to decide whether Johnson simply signed her name differently at different times. Unsurprisingly, that is precisely the explanation the government gave the jury during closing argument. Dkt. 167 at 59–60 (Trial Tr. 576–77).

The Court sees little likelihood that Baggett's or East's handwriting testimony would have swayed the jury in the face of the evidence. To the contrary, this is a case in which "[t]he evidence presented at trial would have made the need for an expert witness . . . insignificant." *United States v. Edwards*, No. 11-cr-129-01, 2019 WL 6219955, at *11 (D.D.C. Nov. 21, 2019). Johnson has, accordingly, failed to carry her burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Payne*, 760 F.3d at 13 (quoting *Strickland*, 466 U.S. at 687–88).

**B.    Other Grounds for Ineffective Assistance**

Johnson also argues that her trial counsel "neglected to pursue other matters which collectively could well have raised a reasonable doubt apart from the use of a handwriting expert to testify that the signatures at issue were not made by Johnson." Dkt. 191 at 13–14. Her argument on this point, however, can be reduced to four propositions, which whether considered together or separately do not amount to ineffective assistance of counsel:

> (1) Trial counsel neglected to offer evidence that Johnson always stamps the returns with her office information, and the 1040x returns presented during the trial were not so stamped. *See* Dkt. 191-1 at 8 (Johnson Decl. ¶ 9);
>
> (2) He failed to show that the IRS had sent Johnson a letter in February 2021 informing her that she was a victim of identity theft, which could well have created a doubt as to whether it was she or someone else who submitted the tax returns. *See* Dkt. 191-1 at 18–21 (IRS letter annexed as Exhibit B to the Johnson Dec. referred to at para. 10 thereof);
>
> (3) He failed to offer evidence that, after she was arrested by IRS criminal investigative agents, Johnson completed and filed IRS Form 14039, Dkt. 191-1 at 23 (Johnson Decl. Exhibit C) as the IRS had instructed her. This

17

could have created an inference that she was not the person submitting the false tax returns as someone else had pirated her identity;

(4) Trial counsel also failed to present evidence that, during Shauna Henline's telephone interview with the government and in her affidavit, Henline never mentioned any of the names from the trial exhibits presented at the trial but mentioned them freely at trial.

*Id.* at 14.

Johnson's alternative grounds for seeking to vacate her conviction and sentence fall well short of satisfying the *Strickland* standard. She makes little (to no) effort to explain why these four decisions by her trial counsel fell outside "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and she makes little (to no) effort to argue that, absent these purported errors, "the result of the proceeding would have been different," *Payne*, 760 F.3d at 13 (quoting *Strickland*, 466 U.S. at 687–88). To take just one example, Johnson fails to explain how evidence of identify theft would have invited the jury to disregard her declaration admitting that she prepared the Moores' returns; the fact that she prepared the Moores' 2011 Form 1040; and the testimony of Bladen Russell that Johnson, in fact, prepared his fraudulent return at issue in Count One. The Court declines to set aside the judgment and sentence imposed in this case based on so sparse a showing.

## CONCLUSION

For the foregoing reasons, Defendant's motion to set aside her sentence, Dkt. 192, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 5, 2023